## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **BRUCE AND MARY ANN FEIRSON**<br><br>**Plaintiffs,**<br><br>v.<br><br>**DISTRICT OF COLUMBIA, et al.,**<br><br>**Defendants.** | Civil Action No. 01-0905 (JDB) |

## MEMORANDUM OPINION

Plaintiffs Sgt. Bruce and Mary Ann Feirson bring this action against the District of Columbia ("the District") and Michelle Smith-Jefferies, M.D. ("Dr. Smith-Jefferies"), Taunya Brownlee, M.D. ("Dr. Brownlee"), and Craig Throne, M.D. ("Dr. Thorne") (collectively "physician defendants")[1] for injuries suffered by Sgt. Feirson during an "attack exercise" as part of his training as a District of Columbia police officer. Presently before the Court are the physician defendants' motions for summary judgment on Sgt. Feirson's claims under 42 U.S.C. § 1983 and the common law[2] and on Mary Ann Feirson's common law claim for loss of consortium. For the

---

[1] Although the physician defendants will be addressed collectively throughout this Memorandum Opinion, plaintiffs brought this action against each physician in his or her individual capacity, and therefore plaintiffs must establish their claims against each physician defendant individually. Each physician defendant has filed a separate motion for summary judgment.

[2] Sgt. Feirson's common law claims against the physician defendants are intentional infliction of emotional distress, negligence, and assault and battery. Sgt. Feirson, in his opposition to the physician defendants' motions for summary judgment, conceded he could not establish a claim for assault and battery against the physician defendants. See Pl. Opp. at 24. Therefore, that claim is dismissed.

reasons that follow, the Court will grant each physician defendant's motion for summary judgment.

## BACKGROUND

This case arises from Sgt. Bruce Feirson's participation in the Armament Systems Proficiency ("ASP") training program conducted by the Metropolitan Police Department ("MPD"). ASP training teaches MPD officers, such as Sgt. Feirson, how to use the ASP baton through both classroom instruction and physical exercises. One of those exercises is an "attack" exercise in which trainees, equipped with an ASP, must fend off an instructor acting as a violent suspect. During one of these attack exercises Sgt. Feirson was injured.

Within the MPD, the Medical Services Division ("MSD") of the Human Services department is responsible for the medical care of police officers. As part of that responsibility, police officers receive medical care through the Police and Fire Clinic ("clinic") for injuries suffered on the job. In February of 1997, the District of Columbia transferred operation of the clinic to PFC Associates, a private professional health organization. The physician defendants were all at the relevant times of this lawsuit employed by PFC Associates. Dr. Smith-Jefferies and Dr. Thorne, at different times, were the Medical Directors of the clinic. MPD also maintains liaisons within the clinic who coordinate medical care for police officers.

## LEGAL STANDARD

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56©). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex

Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed.R.Civ.P. 56(c))).

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position.  Id. at 252.  By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment.  Celotex, 477 U.S. at 322.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249-50 (internal citations omitted).  Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

## ANALYSIS

**I.    Section 1983**

The physician defendants move for summary judgment on Sgt. Feirson's section 1983 claim.  They observe that under this Court's Memorandum Opinion and Order of March 30, 2004, confirmed in a September 14, 2004 Order denying plaintiff's motion for reconsideration, Sgt. Feirson's section 1983 claim was dismissed against the District of Columbia.  In that earlier Memorandum Opinion, the Court ruled that Sgt. Feirson could not establish that the District's

actions constituted an unreasonable seizure under the Fourth Amendment or excessive force under the Fifth Amendment. See March 30, 2004 Mem Op. at 13, 17. The physician defendants argue that the March 30, 2004 Order (as confirmed by the September 14, 2004 Order) established the law of this case as to Sgt. Feirson's section 1983 claim, and therefore they should be granted summary judgment on Sgt. Feirson's section 1983 claims against them.

The physician defendants' arguments on this point draw heavily from the law of the case doctrine. Under this doctrine, when the same issue is presented to the same court, in the same case, the results should be the same. See LaShawn A. v. Barry, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (under the law of the case doctrine "the same issue presented a second time in the same case in the same court should lead to the same result"). The doctrine is particularly persuasive here. Unless plaintiff can present additional facts relevant to his section 1983 claims against the physician defendants, this Court's ruling that plaintiff cannot establish constitutional violations against the District of Columbia pursuant to section 1983 should also govern Sgt. Feirson's section 1983 claims against the physician defendants.

Sgt. Feirson does not present any new or unique facts relevant to his section 1983 claims against the physician defendants that would convince the Court to reexamine its previous decision regarding Sgt. Feirson's section 1983 claims. Plaintiff's response to the physician defendants' motions is merely to reargue his motion for reconsideration of the March 30, 2004 Order. See Pl. Opp. at 27 (premising all his arguments regarding section 1983 claims against physician defendants on Court granting motion to reconsider). However, plaintiff's motion for reconsideration was denied, and because Sgt. Feirson does not present any new facts or law relevant to his section 1983 claims against the physician defendants, the Court's prior

determination regarding Sgt. Feirson's section 1983 claim will govern.

## II.     Intentional Infliction of Emotional Distress

Sgt. Feirson also brings a claim for intentional infliction of emotional distress against the physician defendants. In order to state a claim for intentional infliction of emotional distress, Sgt. Feirson must establish: "(1) extreme and outrageous conduct on the part of defendant which (2) either intentionally or recklessly (3) causes the plaintiff severe emotional distress." Howard Univ. v. Best, 484 A.2d 958, 985 (D.C. 1984). Additionally, "[t]he conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Larijani v. Georgetown Univ., 791 A.2d 41, 44 (D.C. 2002) (quoting Homan v. Goyal, 711 A.2d 812, 818 (D.C.1998)).

Here, Sgt. Feirson alleges that each of the physician defendants failed to take action to stop the ASP training despite "substantial knowledge that their patients were being intentionally assaulted in the ASP attack exercise. See Pl. Opp. at 25. He also argues that the physician defendants' affirmative acts of reviewing and approving the ASP training program constituted reckless or intentional conduct that caused Sgt. Feirson's injuries. The "extreme or outrageous" nature of this alleged intentional or reckless conduct, according to Sgt. Feirson, is that the physician defendants each had a patient-physician relationship with plaintiff. Id. The physician defendants contend that the record does not support the claim that they engaged in intentional or reckless conduct that caused Sgt. Feirson's emotional distress or that any of their conduct was extreme and outrageous.

Sgt. Feirson's first claims that the physician defendants had knowledge of the significant injuries occurring during the ASP training and that their failure to stop the training program

amounts to extreme and outrageous intentional or reckless conduct. Sgt. Feirson testified at his deposition that there were "rampant" rumors of the assaults occurring during ASP training amongst MPD officers. See Feirson Dep. (Pl. Opp. Ex. 8) at 27. Plaintiff relies on further evidence of rumors through the deposition of Lt. Sheila Ford, the police liaison officer at the clinic, who acknowledged that in her opinion "it is common knowledge among department employees that the ASP-training program has caused a lot of injuries to police officers." Ford Dep. (Pl. Opp., Ex. 12) at 92.

      Plaintiff also proffers the medical records of other police officers injured through the ASP attack exercises as evidence that the physician defendants were aware that substantial injuries were occurring. See Pl. Opp. at 11-13. The medical records show that Dr. Thorne, prior to Sgt. Feirson's injuries, had been involved in some manner in the examination of nine officers who reported some form of an injury from ASP training. See Dr. Thorne Statement of Material Facts As To Which There Is No Genuine Issue ("Thorne Statement") ¶ 10. Of those nine, however, only two involved injuries from hitting or punching. Id. Dr. Smith-Jefferies provides similar information, stating that she only examined one officer complaining of an injury from ASP training, and that injury was not caused by someone hitting or punching the officer. See Dr. Smith-Jefferies Statement of Material Facts As To Which There Is No Genuine Issue ("Smith-Jefferies Statement") ¶ 10. Finally, Dr. Brownlee testified that she examined twelve officers injured by ASP training, of whom two exhibited symptoms that were serious and caused by hitting or punching when they were seen by Dr. Brownlee. See Dr. Brownlee Statement of Material Facts As To Which There Is No Genuine Issue ("Brownlee Statement") ¶ 10. In total, the physician defendants examined 17 different officers, since five others were seen by two of the

physician defendants, and only four had injuries that were serious and caused by punching or kicking.[3]  Notwithstanding these medical records, all the physician defendants have claimed that they were not personally aware of the nature of ASP training prior to Sgt. Feirson's injury.  See Thorne Statement ¶ 3; Smith-Jefferies Statement ¶ 3; Brownlee Statement ¶ 3.

Sgt. Feirson also contends that the evidence shows that the physician defendants were asked to review and approve the ASP training before he was injured.  See Pl. Opp. at 7.  Sgt. Feirson testified that he was told by Lt. Ford that the physician defendants were asked to review and approve the ASP training exercises.  See Feirson Dep. (Pl. Opp. Ex. 88) at 73.  However, when Lt. Ford testified herself, she refuted the testimony given by Sgt. Feirson.  She testified that doctors at PFC were not asked to and did not review the ASP program.  See Smith-Jefferies. Mot., Ex. 5 [Ford] at 37-39.

Upon review of the evidence proffered by Sgt. Feirson, and viewing it in the light most favorable to him as the Court must on a Rule 56 motion for summary judgment, the Court concludes that there is no genuine issue of material fact as to the alleged extreme and outrageous conduct of the physician defendants.  There is no evidence in the record that any of the physician defendants engaged in any extreme and outrageous intentional or reckless conduct that caused Sgt. Feirson emotional distress.

Under D.C. law, a plaintiff may recover for intentional infliction of emotional distress

---

[3]  It is also noteworthy that the physician defendants' examinations of these officers frequently came days or weeks after the officer was injured and after the officer was examined by other doctors.  See Pl. Opp., Tab 1 (Chart summarizing medical reports).  For example, of the nine officers examined by Dr. Thorne, he performed the initial examination on only one officer.  Id.  Likewise, Dr. Brownlee performed the initial examination on only four of the twelve officers that she examined.  Id.

only in situations in which the defendant's conduct is " 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " Kerrigan v. Britches of Georgetowne, 705 A.2d 624, 628 (D.C.1997).  The question on summary judgment is whether, based on the evidence in the record, "a reasonable jury could find that defendant's conduct was both sufficiently outrageous to satisfy this standard, and whether that conduct was done intentionally to hurt plaintiff, or at least with conscious disregard of his or her emotional well-being." See Liser v. Smith, 254 F.Supp.2d 89, 106 (D.D.C. 2003) (citing Homan, 711 A.2d at 820).

      No reasonable jury could find that any of the physician defendants engaged in intentional or reckless conduct that was sufficiently extreme and outrageous.  Sgt. Feirson relies principally on rumors and medical records to assert that the physician defendants were aware that substantial injuries were occurring to police officers at ASP training exercises.  See Feirson Dep. (Pl. Opp. Ex. 8) at 27.  However, not only is Sgt. Feirson's testimony based on otherwise inadmissible hearsay, but his testimony regarding the rumors at the police station did not attribute knowledge of the injuries to the specific physician defendants.  Id.  Furthermore, the relevant medical records show that over the period before Sgt. Feirson was injured, the physician defendants collectively examined only four officers who suffered serious injuries, similar in nature to Sgt. Feirson's, from ASP training.  They also collectively examined only 17 officers who were injured in any manner during ASP training.  The physician defendants also testified that they were not aware of the nature of any serious injuries occurring at ASP training.  This evidence is far short of establishing that the physician defendants' failure to stop ASP training amounted to extreme and outrageous conduct.

Sgt. Feirson's evidence that the physician defendants were asked to review and approve the ASP training program is equally insufficient. His testimony about the physician defendants reviewing and approving ASP training is not only hearsay, but again does not identify the three physician defendants as being involved in any review or approval process. See Feirson Dep. (Pl. Opp. Ex. 88) at 73. Moreover, Lt. Ford in her testimony rejected the suggestion that anyone associated with PFC was asked to review or approve the ASP training. Therefore, on this record no reasonable jury could conclude that the physician defendants reviewed and approved the ASP training program.

### III. Negligence

Sgt. Feirson also brings a negligence claim against the physician defendants. To establish a negligence claim, a plaintiff must show: (1) a duty owed by the defendant to the plaintiff, (2) which defendant breached, (3) and that the breach proximately caused plaintiff's (4) damages. See Haymon v. Wilkerson, 535 A.2d 880, 882 (D.C. 1987). Sgt. Feirson's theory of negligence is based upon the physician defendants' failure to act to protect him. See Pl. Opp. at 3. Establishing that an individual defendant had an affirmative duty to protect another person is very difficult because generally the common law does not impose such a duty. See Restatement (Second) of Torts § 314 ("The fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not itself impose upon him a duty to take such action."). Plaintiff presents essentially three theories in an attempt to establish that the physician defendants had a duty to act -- first, the existence of a patient-physician relationship, second, an affirmative duty created from the PFC contract, and finally, the physician defendants' knowledge of ASP injuries, and their past actions to protect officers from other injuries. See Pl. Opp. at 3-15.

Sgt. Feirson argues that, as his doctors, the physician defendants had a special relationship with him which required them to take action to protect him. See Caldwell v. Bechtel, Inc., 631 F.2d 989, 1002 (D.C. Cir. 1980) (relying on "special relationship" between plaintiff and defendant to impose affirmative duty on defendant to protect plaintiff from certain harms); see also Prosser and Keeton on the Law of Torts § 56 (5th ed. 1984) (discussing "special relationships" that may create an affirmative duty to act). The generally recognized special relationships that give rise to a duty to protect are: common carrier-passenger; innkeeper-guest; landowner-invitee; one obligated by the law; or one who voluntarily takes custody of another and in doing so deprives that person of the ability to protect himself. See Restatement (Second) of Torts § 314A. Clearly none of these situations apply here. Instead, in this case, Sgt. Feirson argues that because there was a patient-physician relationship between himself and the physician defendants, they were obligated to take action to protect him from injury.

In support of this theory, Sgt. Feirson testified that all the physician defendants were his doctors. See Feirson Dep. (Pl. Opp., Ex. 88) at 74. Dr. Thorne testified, moreover, that on one occasion before Sgt. Feirson was injured in the ASP training he treated Sgt. Feirson for a different injury. See Thorne Dep. (Pl. Opp., Ex. 87) at 10-11. Sgt. Feirson also put into the record the contract between PFC Associates and the District of Columbia as a basis for asserting a patient-physician relationship between all doctors at PFC and all MPD police officers. See Pl. Opp., Ex. 6. Under the contract signed by PFC and the District, the doctors at PFC would provide medical services for all members of the MPD. Id.

In assessing whether a patient-physician relationship exists, this Court concludes there are no genuine issues of material fact in dispute. Moreover, on those facts, Sgt. Feirson has not

established that he had a patient-physician relationship with any of the physician defendants.[4] He was never examined by Dr. Brownlee or Dr. Smith-Jefferies. Moreover, the contract between PFC and the District of Columbia is insufficient to establish a patient-physician relationship. See In re Sealed Case, 67 F.3d 965, 969-71 (D.C. Cir. 1995) (contract doctor hired by a physician to review physician's work did not have a patient-physician relationship with wife of physician's patient); Sawh v. Schoen, 627 N.Y.S.2d 7, 9-10 (N.Y. App. Div. 1995) (physician part of a group practice did not have patient-physician relationship with patient of associate's doctor, even though patient's case was discussed among associates).

In the case of Dr. Thorne, who once treated Sgt. Feirson on an unrelated matter, he denies the existence of an ongoing patient-physician relationship with Sgt. Feirson. See Thorne Reply at 2; see also Browne v. Brooke, 236 F.2d 686, 688 (D.C. Cir. 1956) (in finding no patient-physician relationship the court considered statements by doctor that he did not consider his one examination of plaintiff as creating a patient-physician relationship). Dr. Thorne was employed by PFC and assigned to perform examinations of police officers who suffered work related injuries or illness. See Pl. Opp., Ex. 6. But courts have recognized that the patient-physician relationship does not attach in circumstances where a physician is hired by an employer to conduct examinations of employees. See Betesh v. United States, 400 F.Supp. 238, 246-47 (D.D.C. 1974) (recognizing no patient-physician relationship for doctor hired by employer to conduct screening examinations of employees); Gilinsky v. Indelicato, 894 F.Supp. 86 (E.D.N.Y. 1995) (no patient-

---

[4] Under Sgt. Feirson's theory of a duty, he would have to not only establish he had a physician-patient relationship with physician defendants, but also that the relationship gave rise to the physician defendants' duty to protect in a non-medical malpractice setting. Because this Court finds no patient-physician relationship, it need not consider whether that special relationship would establish an affirmative duty in this setting.

physician relationship existed when a psychologist examined workers' compensation claimant at request of workers' compensation carrier). Therefore, because Dr. Thorne did not have an on-going independent relationship with Sgt. Feirson, and merely treated him as part of his employment with PFC, Dr. Thorne was not in a physician-patient relationship with Sgt. Feirson.

Sgt. Feirson also alleges that the physician defendants owed him a duty to act that arose out of the PFC contract. To establish this duty to act, Sgt. Feirson cites the existence of the PFC contract, the physician defendants' alleged obligation to review and approve ASP training, and the specific obligations in the PFC contract. The evidence regarding the general terms of the PFC contract, and the physician defendants' alleged approval of ASP training have already been discussed above. Here, Sgt. Feirson also argues that pursuant to the PFC contract the physician defendants were obligated to review and report "high risk" and "high volume" injuries to the District of Columbia. See Pl. Opp. at 5-6. Under section 4.2 of the contract, PFC had to conduct a Quality Assurance Plan ("QAP"). See Pl. Opp., Ex. 6 at 8-9. PFC was to conduct a monthly review of "high volume" and "high risk" diagnosis. See Pl. Opp., Ex. 90 at 1. Dr. Smith-Jefferies in her testimony acknowledged that PFC did not "regularly perform[]" the QAP because of time constraints. See Pl. Opp., Ex. 91 [Smith-Jefferies] at 143-44.

Examining all the evidence proffered by Sgt. Feirson with regard to the PFC contract, and again viewing it in the light most favorable to Sgt. Feirson as required on a Rule 56 motion for summary judgment, the Court concludes that there is no genuine issue of material fact as to whether the contract between PFC and the District created an affirmative duty on the part of the physician defendants to protect Sgt. Feirson.

First, as discussed earlier, there is no credible evidence that any of the physician

defendants were asked to review or approve the ASP training. The PFC contract, moreover, did not create a duty on the part of each physician defendant to protect Sgt. Feirson from injuries suffered during police training. Of course, the contract was between the District and PFC, not the individual defendant physicians, and hence created no obvious duty as to them. Furthermore, under the terms of the contract, PFC was obligated to provide medical services for the MPD. See Pl. Opp., Ex. 6. In fact, the contract includes fourteen specific services that PFC would provide MPD under the contract, and not one of them compels PFC, much less the physician defendants individually, to take affirmative steps to protect officers. See id. at 7-8.

Sgt. Feirson's theory that the QAP provision of the PFC contract created such a duty is equally unavailing. According to Sgt. Feirson, the QAP provision of the ASP contract obligated the physician defendants to discover and prevent high risk injuries occurring to MPD officers. Moreover, the QAP provision was designed to ensure the quality of medical care provided at the clinic, and did not create a duty on the part of the physician defendants to identify and prevent injuries occurring to police officers. See Pl. Opp., Ex. 90 at 1 (QAP "is designed to assess the quality of care provided at the clinic in order to improve the overall quality of service provided by the clinic.").

Sgt. Feirson's final theory regarding the physician defendants' affirmative duty is that it was part of the physician defendants' job to take action to prevent injuries to officers when they learned that officers were being seriously injured. In support of this theory, Sgt. Feirson cites the testimony of the physician defendants, in which he believes they admit to such a duty. He also proffers evidence that the physician defendants had in the past taken action to prevent injuries to officers. Sgt. Feirson also observes that the medical records establish the seriousness of injuries

occurring during ASP training and those records should have triggered action on the part of the physician defendants. In support of his theory of a duty, Sgt. Feirson also presents expert evidence.

The first evidence proffered by Sgt. Feirson in support of his theory of a duty is the physician defendants' own testimony. Dr. Brownlee stated, at her deposition, that she would view it as part of her job to report to the MPD if she saw "a volume of perhaps high risk behavior or incidents." See Brownlee Dep. (Pl. Opp., Ex. 76) at 51. Dr. Brownlee went on to say that given the high volume of patients that she sees, it would have to be a "significant number to stand out." Id. Similarly, Dr. Smith-Jefferies agreed that if she became aware of an injury-causing practice, she would view it as part of her job to report that. See Smith-Jefferies Dep. (Pl. Opp., Ex. 7) at 103. Sgt. Feirson does not allege that Dr. Thorne made any similar statements.

Sgt. Feirson also presents evidence that Dr. Smith-Jefferies previously notified police and fire department officials that Emergency Medical Services ("EMS") personnel were not taking "universal precautions" when handling bleeding patients. See Smith-Jefferies Dep. (Pl. Opp., Ex. 91) at 104, 160. Furthermore, during the period from 1998 to 2000, Dr. Smith-Jefferies made a few trips to the police training facilities. See id. at 177-187. On one such trip, she observed the physical agility test taken by new recruits because she was concerned that many recruits were being injured in the test and unable to return to duty. Id. at 178.

Sgt. Feirson also cites the medical records as evidence that the physician defendants had seen several ASP related injuries prior to Sgt. Feirson's injury. Sgt. Feirson, finally, placed into the record the testimony of his expert, Dr. David Morowitz ("Dr. Morowitz"), to establish that the physician defendants owed a duty to act. See Pl. Opp. at 10-11. According to Dr. Morowitz,

relying upon the representations of plaintiff, if the physician defendants were confronted with "continuing and increasing" evidence of ASP injuries, to turn a "deaf ear" would "constitute a breach of obligation to the patient which I think transcends the obligation of a physician to an employer."  See Morowitz Dep. (Pl. Opp., Ex. 93) at 32, 41.

      Examining all the evidence proffered by Sgt. Feirson, and again viewing it in the light most favorable to Sgt. Feirson as required on a Rule 56 motion for summary judgment, the Court concludes that there is no genuine issue of material fact as to whether the physician defendants owed Sgt. Feirson a duty to act.  Sgt. Feirson's evidence about the physician defendants' admissions of a duty, past activities, and knowledge of serious ASP injuries is insufficient to establish such a duty to act.  Notwithstanding Sgt. Feirson's interpretation, Dr. Brownlee and Dr. Smith-Jefferies did not acknowledge that they owed Sgt. Feirson a duty to act.  See Brownlee Dep. (Pl. Opp., Ex. 76) at 51; Smith-Jefferies Dep. (Pl. Opp., Ex. 7) at 103.  They merely stated that if they had been aware of serious injuries occurring frequently they would view it as part of their job (not a duty) to intervene.  See id.  Moreover, Dr. Smith-Jefferies' report to police officials regarding the handling of bleeding patients by EMS personnel and her visit to the police training facilities does not establish a duty to act to protect all police officers from injuries in all circumstances.  Nor would it be appropriate to impose such a broad duty on Dr. Smith-Jefferies as a consequence of engaging in otherwise socially beneficial conduct that is unrelated to the injuries suffered by Sgt. Feirson.  See Caldwell, 631 F.2d at 997 (societal expectations, as formed through the common law, comprise the concept of duty).

      The evidence proffered by Sgt. Feirson regarding the physician defendants' knowledge of ASP injuries is also insufficient.  As discussed above, the physician defendants together examined

a total of only four officers, prior to Sgt. Feirson suffering his injury, who suffered some type of serious assault-related injury from ASP training exercises. See Thorne Statement ¶¶ 3, 10 (examined nine officers, two assault-related injuries); Smith-Jefferies Statement ¶¶ 3, 10 (examined one officer); Brownlee Statement ¶¶ 3, 10 (examined 12 officers, two-assault-related injuries).[5] These numbers are far from significant, and well short of the level at which the physician defendants could be expected to act affirmatively. Furthermore, Sgt. Feirson's expert's conclusions are based on the presumption that the physician defendants were seeing "continuing and increasing" evidence of ASP injuries, but based on the record that was simply not the case. Most of the ASP-related injuries observed by each of these physician defendants were twisted knees and ankles, or caused by officers falling to the ground, which would not create any obligation for the physician defendants to act to protect Sgt. Feirson. Therefore, upon all theories offered by Sgt. Feirson, the physician defendants did not have a duty to act to prevent the injuries Sgt. Feirson suffered during his ASP training exercise.

**IV.     Loss of Consortium**

Mary Ann Feirson brings a claim for loss of consortium against each of the physician defendants. However, because the Court concludes that the physician defendants are not liable to Sgt. Feirson for his injuries, her claim for loss of consortium fails against them. See Beeton v. District of Columbia, 779 A.2d 918, 925 n.8 (D.C. 2001) (because Mrs. Beeton could not establish defamation claim, Mr. Beeton's loss of consortium claim also failed); Bergfeld v. Unimin Corp., 226 F.Supp.2d 970, 983 (N.D. Iowa 2002) ("the tort of loss of consortium cannot lie against a defendant when, as a matter of law, the defendant is not liable to the plaintiffs").

---

[5] Dr. Thorne and Dr. Brownlee examined five of the same officers.

**CONCLUSION**

For the foregoing reasons, the Court will grant each physician defendant's motion for summary judgment on Sgt. Feirson's claims under 42 U.S.C. § 1983 and the common law and on Mary Ann Feirson's loss of consortium claim.  A separate order accompanies this memorandum opinion.

/s/ John D. Bates
JOHN D. BATES
United States District Judge

March 29, 2005
Dated

Copies to:

Frank James Eisenhart
James Gregory Dyer
DECHERT PRICE & RHOADS
1775 I Street, NW
Washington, DC 20006
(202) 261-3306
(202) 261-3338
Fax : 202-261-3333
Email: frank.eisenhart@dechert.com
Email: gregory.dyer@dechert.com

Brennan J. Torregrossa
DECHERT LLP
4000 Bell Atlantic Tower
1717 Arch Street
Philadelphia, PA 19103
(215) 994-2358
*Counsel for plaintiffs*

David A. Jackson
OFFICE OF CORPORATION COUNSEL, D.C.

441 Fourth Street, NW
P.O. Box 14600
Room 6S079
Washington, DC 20001-2714
(202) 724-6618
Fax : 202-727-6013
Email: djackson@occ.dcgov.org
*Counsel for the District of Columbia and the physician defendants*

Thomas Michael Hogan
HOGAN & HEALD
11130 Main Street
Suite 310
Fairfax, VA 22030
(703) 591-0003
Fax : (703) 591-4114
Email: thogan@hoganheald.com
*Counsel for the physician defendants*